No. 2014-1529

IN THE

# United States Court of Appeals
# for the Federal Circuit

THE YUROK TRIBE,

Appellant,

v.

U.S. DEPARTMENT OF INTERIOR,

Appellee.

Appeal from the Civilian Board of Contract Appeals
Stephen M. Daniels, Administrative Judge

**REPLY BRIEF OF APPELLANT YUROK TRIBE**

Catherine E. Stetson
Lacy Logsdon
Nathaniel Nesbitt
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Dated: November 24, 2014

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................... 1

ARGUMENT .............................................................................. 1

I.   THE TRIBE'S OCTOBER 2011 CONTRACT PROPOSAL
     REQUIRED A TIMELY RESPONSE. ................................................ 1

     A.   The Tribe's October 2011 Letter was a Title I Proposal and
          Both the Letter and the Communications Between the
          Parties Put BIA on Notice that the Tribe was Requesting a
          Title I Contract. ........................................................... 2

     B.   The ISDA's Specific Declination Procedures Trump the
          Common Law Analysis BIA Urges the Court to Adopt. ............ 7

     C.   The ISDA Anticipates that Some Title I Contract Proposals
          May Be Deficient, and Places the Onus Squarely on BIA to
          Notify the Tribe of that Deficiency. ............................................. 9

II.  THE TRIBE'S CONTRACT PROPOSAL REQUESTED FUNDS
     FOR SERVICES THAT THE BIA IS "AUTHORIZED TO
     ADMINISTER" AND ARE "OTHERWISE PROVIDED TO
     INDIAN TRIBES AND THEIR MEMBERS[.]" ................................. 10

     A.   The Secretary of the Interior is Authorized (and Obligated)
          to Provide Law Enforcement Services in Indian Country. ......... 11

     B.   The BIA Misconstrues the ISDA's Language Regarding
          Programs or Services "Otherwise Provided" to Indian
          Tribes. ...................................................................... 12

     C.   Limiting Title I Contractibility to Programs or Services
          Currently Provided to the Requesting Tribe Conflicts with
          the ISDA's Purpose and the Federal Government's Trust
          Responsibility. ............................................................ 14

ii

**TABLE OF CONTENTS—Continued**

III. THE TRIBE'S ARGUMENT THAT ITS TITLE I REQUEST IS CONTRACTIBLE DOES NOT RENDER SECTION 450F(A)(2)(D) "INOPERATIVE, MEANINGLESS, OR VOID." ...... 16

IV. *LOS COYOTES* DOES NOT DEFEAT THE TRIBE'S CLAIMS........ 18

CONCLUSION ............................................................................. 20

CERTIFICATE OF SERVICE ..................................................... 22

CERTIFICATE OF COMPLIANCE............................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Harris v. Dep't of Veterans Affairs*,
142 F.2d 1463 (Fed. Cir. 1998) ...........................................................4

*Hannahville Indian Cmty. v. Minneapolis Area Educ.Officer & Area Supervisory Contract Specialist*,
34 IBIA 4, 1999 WL 651790 (June 8, 1999).....................................9

*Hopland Band of Pomo Indians v. Norton*,
324 F. Supp. 2d 1067 (N.D. Cal. 2004).......................................*passim*

*Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*,
729 F.3d 1025 (9th Cir. 2013) ...............................................18, 19, 20

*Montana v. Blackfeet Tribe of Indians*,
471 U.S. 759 (1985)..................................................................6, 13

*N. L. R. B. v. Burns Int'l Sec. Servs., Inc.*,
406 U.S. 272 (1972)...........................................................................8

*Pyramid Lake Paiute Tribe v. Burwell*,
No. 1:13-cv-01771, 2014 WL 5013206 (D.D.C. Oct. 7, 2014).........................18

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*,
87 F.3d 1338 (D.C. Cir. 1996) ...........................................................7

*Salazar v. Ramah Navajo Chapter*,
132 S. Ct. 2181 (2012)......................................................................7

*Seneca Nation of Indians v. U.S. Dep't of Health and Human Services*,
945 F. Supp. 2d 135 (D.D.C. 2013).............................................*passim*

*Shoshone Indian Tribe of Wind River Reservation v. United States*,
364 F.3d 1339 (Fed. Cir. 2004) .........................................................6

*Southern Ute Indian Tribe v. Sebelius*,
657 F.3d 1071 (10th Cir. 2011) .........................................................8

*Texas Instruments Inc. v. United States*,
   922 F.2d 810 (Fed. Cir. 1990), *op.modified on reh'g* (1991) .............................4

*United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
   508 U.S. 439 (1993) ...........................................................................................14

STATUTES

25 U.S.C. § 13 .......................................................................................................11

25 U.S.C. § 450a ..............................................................................................15, 18

25 U.S.C. § 450a(b) ..............................................................................................14

25 U.S.C. § 450b(j) .....................................................................................12, 13, 14

25 U.S.C. § 450f(a)(1)(B) ................................................................................*passim*

25 U.S.C. § 450f(a)(2) .....................................................................................*passim*

25 U.S.C. § 450j-1(a)(1) ..................................................................................12, 17

25 U.S.C. § 2802 .......................................................................................11, 12, 19

REGULATIONS

25 C.F.R. § 900.3(b)(8) ........................................................................................15

25 C.F.R. § 900.3(b)(11) ......................................................................................5, 6

25 C.F.R. § 900.8 .................................................................................................3

25 C.F.R. § 900.15(b) ...........................................................................................9

25 C.F.R. § 900.16 .......................................................................................*passim*

25 C.F.R. § 900.22 ...........................................................................................8, 11

25 C.F.R. § 900.24 .................................................................................................8

25 C.F.R. § 1000.170 ............................................................................................3

61 Fed. Reg. 32,486 (June 24, 1996) ......................................................................9

69 Fed. Reg. 6321 (Feb. 10, 2004) .......................................................................13

## OTHER AUTHORITIES

S. Rep. No. 100-274 (1987), *reprinted in* 1988 U.S.C.C.A.N. 2620 ..........10, 15, 16

S. Rep. No. 103-374 (1994) ..................................................................................6, 16

## INTRODUCTION

The Bureau of Indian Affairs ("BIA")'s post-hoc rationalizations do not permit them to evade the consequences of its statutory obligations. The Tribe submitted a Title I proposal, and the record makes plain that BIA was well aware that the Tribe was seeking a Title I contract. The Tribe's proposal was contractible because it implicated programs and services that the Secretary of the Interior is "authorized to administer for the benefit of Indians" under federal law. The Indian Self-Determination Act ("ISDA") commanded a timely response, yet BIA's purported declination came more than a year after the statutory deadline. BIA's declination was too little too late; the proposal was deemed approved by operation of law, and BIA was obligated to award the contract.

## ARGUMENT

### I. THE TRIBE'S OCTOBER 2011 CONTRACT PROPOSAL REQUIRED A TIMELY RESPONSE.

BIA's arguments about the Tribe's October 2011 proposal can be distilled to the refrain that BIA was under no obligation to respond to the contract proposal because the Tribe's letter was ambiguous in intent. BIA is wrong. To begin with, the letter itself and the communications between the parties made clear that the Tribe intended to submit a Title I contract proposal. The ISDA also contemplates that some proposals may be deficient in certain respects; squarely places the onus on BIA to notify the tribe of any such deficiencies; and, in all events, requires a

1

response within 90 days.  The Court should reject BIA's attempt to evade the ISDA's declination procedures and the firm statutory requirement that BIA timely respond to the Tribe's request.

### A. The Tribe's October 2011 Letter was a Title I Proposal and Both the Letter and the Communications Between the Parties Put BIA on Notice that the Tribe was Requesting a Title I Contract.

BIA argues that the Tribe never submitted a valid "proposal" because its October 2011 letter was ambiguous in intent.  Yet the proposal itself, as well as the subsequent communications between the parties, show that the Tribe was requesting a Title I contract.  There is no question that BIA knew precisely what the Tribe was seeking.  And to the extent the term "proposal" can be construed as narrowly as BIA would have it—namely to exclude even those that *self-identify* as Title I proposals—the Court should reject that approach as inconsistent with the Indian canon of construction and the very purpose of the ISDA.

First, the proposal itself conveys that the Tribe sought a Title I contract. Appellant's Br. 25-27.  BIA makes much of the Tribe's having submitted its proposal to the wrong office within BIA.  Yet it was *BIA* that recognized the error and forwarded the request to the appropriate office.  Appellant's Br. 26-27; *see also* JA29-30.  And the Tribe subsequently directed all correspondence to the appropriate office.  Appellant's Br. 27-28; JA33, 71-72.

Similarly, the letter's use of the terms "compact," "letter of interest," and "annual funding agreement" do not undermine the fact that the proposal expressly *self-identified* as a Title I proposal, and included the majority of the categories of information required of such a proposal, including a Tribal Council Resolution authorizing the proposal—a requirement *unique* to Title I. *Compare* 25 C.F.R. § 1000.170 (setting forth requirements for a letter of interest under Title IV) *with id.* § 900.8 (setting forth requirements of a Title I contract proposal); *see generally* Appellant's Br. 24-26.

*Seneca Nation of Indians* is instructive. In *Seneca*, the Secretary argued that the Tribe's letter requesting an amendment to its Title I contract was a "claim," not an amendment, and thus that the Secretary did not need to respond within 90 days. *Seneca Nation of Indians v. U.S. Dep't of Health and Human Services*, 945 F. Supp. 2d 135,148-49 (D.D.C. 2013). The court disagreed. Notwithstanding that the tribe's letter used the word "claim" multiple times, the court found that the letter "put [the Secretary] on notice that the Nation intended to propose an amendment and believed that it was doing so." *Id.* Accordingly, "ordinary principles of good faith dealing in contracts behooved the Secretary to notify the Nation in a timely manner that it disagreed, rather than simply wait for the 90-day period to expire." *Id.* The same result should obtain here. The Tribe's "Title I Request" (JA12) expressly so identified in the Tribe's contemporaneous email to BIA (JA29) with

3

the accompanying Tribal Council Resolution required under the Title I regulations (JA27) "put [BIA] on notice that the [Tribe] intended to propose a [Title I contract] and believed that it was doing so." *Seneca Nation*, 945 F. Supp. 2d at 148.

Moreover, to whatever extent BIA was initially confused by the Tribe's proposal, subsequent communications between the parties make abundantly clear that BIA knew exactly what the Tribe was requesting. It is established that "[w]hether a legally enforceable contract has been formed by a meeting of the minds depends upon the totality of the factual circumstances." *Texas Instruments Inc. v. United States*, 922 F.2d 810, 815 (Fed. Cir. 1990), *op.modified on reh'g* (1991). "If there is an ambiguity in the formation of the agreement or during its performance, we implement the intent of the parties at the time the agreement was struck." *Harris v. Dep't of Veterans Affairs*, 142 F.2d 1463, 1467 (Fed. Cir. 1998).[1]

The Tribe emailed the Office of Justice Services multiple times to follow up on the status of its "Title I request," JA33, 39, 40, 71-72; met with Office of Justice Services personnel to discuss its request, JA36, 42, 72; and sent two letters, one on February 1, 2012 and the other two weeks later, seeking performance under the Title I contract, JA44-49, 72-73; *see generally* Appellant's Br. 10-13, 26-28. In

---

[1]    As set forth in Part I.B, *infra*, the novelty in Title I cases is that BIA's "intent" to enter the contract is removed from the equation: what matters is whether BIA complied with the statutorily-delineated declination procedures.

4

light of all this record evidence, there is no reasonable argument to be made that BIA was unaware that the Tribe was seeking a Title I contract.

Instead, BIA urges the court to accept an unduly narrow reading of Section 450f(a)(2). That Section provides that the Secretary "shall, within ninety days after receipt of the proposal, approve the proposal and award the contract…." 25 U.S.C. § 450f(a)(2); *see also* 25 C.F.R. § 900.16. BIA argues that the Tribe did not submit a "proposal," and that even if it *were* subsequently made aware that the Tribe's October 2011 proposal was intended as a Title I contract proposal, that would be irrelevant because the Tribe did not then resubmit its proposal so as to trigger the "after receipt of the proposal" language. *See* Appellee's Br. 34-35.

That sclerotic interpretation of Title I's contracting provision is at odds with the Indian canon of construction as well as the very purpose of the ISDA and the Secretary's unique trust relationship with Indian tribes. The ISDA's regulations emphasize"[t]he Secretary's commitment to Indian self-determination," which "requires that these regulations be liberally construed for the benefit of Indian tribes and tribal organizations to effectuate the strong Federal policy of self-determination[.]" 25 C.F.R. § 900.3(b)(11) (2014). That is, "any ambiguities herein [must] be construed in favor of the Indian tribe or tribal organization so as to facilitate and enable the transfer of services, programs, functions, and activities, or portions thereof, authorized by the Act." *Id.* The ISDA's regulations thus

incorporate the "long-standing canon of statutory construction that 'statutes are to be construed liberally in favor of the Indians . . . .'" *Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1352 (Fed. Cir. 2004) (*quoting Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)); *see also* Appellant's Br. 30-31 (noting that the canon is enshrined in the ISDA itself). To the extent the term "proposal" can be construed as narrowly as BIA would have it—namely to exclude even those that *self-identify* as Title I proposals—or that the phrase "after receipt of the proposal" can be read to require a tribe to *resubmit* a Title I proposal after emphasizing its intentions in submitting it, the Court should reject that approach. Rather, the court should construe the statutory and regulatory language liberally in favor of the Tribe. *See, e.g.*, 25 C.F.R. § 900.3(b)(11); *Shoshone Indian Tribe of Wind River Reservation*, 364 F.3d at 1352; Appellant's Br. 30-31.

Moreover, as the Tribe explained in its opening brief, Congress amended the ISDA multiple times in an effort to address agencies' persistent failures to effectively administer self-determination contracts. Appellant's Br. 1-3. Indeed, Congress was expressly concerned with the "layers of bureaucracy and rules" the agencies imposed on the self-determination contract approval process, *see* S. Rep. No. 103-374, at 2 (1994) ("1994 Report"), and thus intended to "circumscribe as tightly as possible the discretion of the Secretary" in the self-determination

contracting process. *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1344
(D.C. Cir. 1996); *see generally* Appellant's Br. 2-4.  It would offend these
principles to read "proposal" or "after receipt of a proposal" so narrowly as to
require tribes to jump through additional hoops to make doubly (or triply) sure that
BIA is taking their requests seriously.  *See* Appellant's Br. 30-34.

### B. The ISDA's Specific Declination Procedures Trump the Common Law Analysis BIA Urges the Court to Adopt.

BIA urges the Court to adopt a typical contract formation analysis.
Appellee's Br. 24-26 (enumerating elements of offer, acceptance, consideration,
and authority to bind the government).  But while common law contract principles
may inform a court's *interpretation* of contracts formed under the ISDA, *see
Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2186, 2189 (2012), the
ISDA's declination procedures supplant the common law with regard to the
questions of contract formation at issue here.

Title I sets forth specific procedures for requesting, and for BIA's grant or
declination of, a Title I contract proposal.  Of particular note here, the ISDA
restricts the available bases for declination of a proposal; demands a response to
such proposals within a certain time; and places the onus on the *offeree*—BIA—to
identify deficiencies in such proposals.  As for acceptance, "the Secretary shall,
within ninety days . . . approve the proposal and award the contract *unless* the
Secretary provides written notification to the applicant that contains a specific

finding" that one or more of the statutorily-enumerated declination criteria applies. 25 U.S.C. § 450f(a)(2); *see also* 25 C.F.R. § 900.16 ("The [BIA] has 90 days after receipt of a proposal to review and approve the proposal and award the contract or decline the proposal…."). Acceptance, in other words, is the statutorily-mandated *default* absent a timely response. *See generally* Appellant's Br. 1-5, 29-30; *see also, e.g.*, *Seneca Nation*, 945 F. Supp. 2d at 145 (amendments to a Title I contract became effective upon BIA's failure timely to respond to the tribe's proposal). That approach, of course, differs from general contract law. *See, e.g.*, *N. L. R. B. v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 285 (1972) ("[u]nder normal contract principles a party would not be bound to a contract in the absence of consent.").

Moreover, also unlike typical contract law, the Secretary can only decline a proposal for five reasons. *E.g.*, 25 C.F.R. § 900.22 ("The Secretary may only decline to approve a proposal for one of five specific reasons"); *see also id.* § 900.24 (reasons set forth in 900.22 are exclusive); *Southern Ute Indian Tribe v. Sebelius*, 657 F.3d 1071, 1078-80 (10th Cir. 2011) (Secretary of Health and Human Services could not decline ISDA contract proposal for lack of available funds).

Accordingly, BIA is incorrect to suggest that "a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance" to prevail in a Title I deemed contract case like this one. *See* Appellee's Br. 25 (citation

8

omitted).  The ISDA does not contemplate a typical common-law analysis of contract formation.

### C. The ISDA Anticipates that Some Title I Contract Proposals May Be Deficient, and Places the Onus Squarely on BIA to Notify the Tribe of that Deficiency.

The ISDA provides for cases in which a tribe's proposal is deficient.  In such cases, Congress squarely placed on BIA the onus of alerting the tribe to any such deficiencies.  *See generally* Appellant's Br. 28-29.

Incomplete contract proposals may not simply be ignored.  *See* 25 C.F.R. § 900.15(b); Indian Self-Determination and Education Assistance Act Amendments, 61 Fed. Reg. 32,486 (June 24, 1996).  Instead, the regulations require BIA, within 15 days of receipt, to notify a Tribe of any missing information, and to provide the Tribe with an opportunity to furnish such information.  25 C.F.R. § 900.15(b); *see also Hannahville Indian Cmty. v. Minneapolis Area Educ. Officer & Area Supervisory Contract Specialist*, 34 IBIA 4, 11, 1999 WL 651790, at *6 (June 8, 1999) (holding that Section 900.15(b) grants applicants "a substantive right to be notified" fi any of the required information is missing).  In any event, notwithstanding any missing information, BIA must still respond within 90 days.  61 Fed. Reg. 32,486; *see also* 25 C.F.R. § 900.16.

The Tribe's October 2011 letter notified BIA that the Tribe was seeking a Title I contract.  *See Seneca Nation*, 945 F. Supp. 2d at 148.  If the Secretary

wished to take the position that the Tribe's letter was missing critical elements or was not a proper contract proposal, "she should have done so within the statutorily provided 90 days." *Id.* at 149.

## II. THE TRIBE'S CONTRACT PROPOSAL REQUESTED FUNDS FOR SERVICES THAT THE BIA IS "AUTHORIZED TO ADMINISTER" AND ARE "OTHERWISE PROVIDED TO INDIAN TRIBES AND THEIR MEMBERS[.]"

Where an Indian tribe submits a Title I contract proposal for services that the Secretary is "authorized to administer for the benefit of Indians" under federal law, 25 U.S.C. § 450f(a)(1)(B), the ISDA "requires the Secretary to contract with a tribe so requesting unless one of the statutory exceptions is shown." *Hopland Band of Pomo Indians v. Norton*, 324 F. Supp. 2d 1067, 1074 (N.D. Cal. 2004) (Title I request for law enforcement services contractible because BIA is authorized to enforce federal laws and provide for law enforcement services in Indian country).

A 1988 Senate Report emphasized the following:

> Restated in the amendments is important language regarding the contractibility of programs which the Secretary is authorized to administer for the benefit of Indians under [federal law]. The purpose of restating this language is to clarify that the Secretary is not to consider any program or portion thereof to be exempt from self-determination contracts.

S. Rep. No. 100-274 at 23 (1987), *reprinted in* 1988 U.S.C.C.A.N. 2620, 2642 ("1988 Senate Report"). Because the Secretary is authorized to administer law enforcement and judicial functions in Indian country under federal law, the Tribe's

Title I request was contractible and the BIA was required to respond in accordance with the approval and declination procedures outlined in the ISDA. 25 U.S.C. § 450f(a)(2); *see also* 25 C.F.R. § 900.22(a)-(e) ("The Secretary may only decline to approve a proposal for one of five specific reasons…."); 25 C.F.R. § 900.16 ("The [BIA] has 90 days after receipt of a proposal to review and approve the proposal and award the contract or decline the proposal.").

### A. The Secretary of the Interior is Authorized (and Obligated) to Provide Law Enforcement Services in Indian Country.

Under the Snyder Act, 25 U.S.C. § 13 (1998), the Secretary is required to "direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit . . . of the Indians throughout the United States for . . . the employment of  . . . Indian police . . . ."  The ISDA specifically makes this program a contractible Title I service. 25 U.S.C. §450f(a)(1)(B). The Indian Law Enforcement Reform Act (the "ILERA") clarified and expanded the Secretary's obligation to provide law enforcement services by establishing the Office of Justice Services as well as a division within the BIA dedicated to providing law enforcement services for Indian tribes on reservations within the United States. 25 U.S.C. § 2802 (2010), *et seq.* The ILERA provides that the "Secretary, acting through the Bureau, *shall* be responsible for providing . . . law enforcement services in Indian country." *Id*. at  § 2802(a) (emphasis added). And the ILERA specifically identifies the types of law enforcement services the Secretary has an

11

obligation to provide. *Id.* § 2802(c) (listing, *inter alia*: (1) the enforcement of

Federal law and, with the consent of the Indian tribe, tribal law; (2) investigation of

federal offenses; (3) the protection of life and property; (4) correctional,

rehabilitation, and detention services; (5) the development of preventative and

outreach programs; and (6) the development and provision of law enforcement

training and technical assistance).  The Office of Justice Services also provides

funding, training and program support to tribal courts. *Id.* § 2802(c)(16).

### B. The BIA Misconstrues the ISDA's Language Regarding Programs or Services "Otherwise Provided" to Indian Tribes.

The BIA admits that law enforcement and judicial functions are "proper

subjects of a self-determination contract," but nonetheless contends that the Tribe's

contract proposal was not entitled to a response because the "ISDA requires that

the subject program or service to be transferred is 'otherwise provided' by BIA *to*

*the requesting tribe*." Appellee's Br. 17 (emphasis added) (citing 25 U.S.C. §§

450b(j), 450j-1(a)(1)).[2] This argument misconstrues the statute. Section 450(b)(j)

does not require that a contract transfer programs or services "otherwise provided"

---

[2] Section 450j-1(a)(1) provides that "[t]he amount of funds provided under the terms of self-determination contracts entered into pursuant to this subchapter *shall not be less* than the appropriate Secretary would have *otherwise provided for the operation of the programs* or portions thereof for the period covered by the contract." 25 U.S.C. § 450j-1(a)(1) (emphasis added). This provision says nothing about the contractibility of a Title I proposal; rather, it simply dictates the minimum ("not less than") amount of funds that must be awarded once the proposal has been approved.

to the *requesting tribe*; rather, the provision defines a self-determination contract as one "entered into . . . between a tribal organization and the . . . Secretary for the planning, conduct and administration of programs or services which are *otherwise provided to Indian tribes* and their members pursuant to Federal law." 25 U.S.C. §450b(j) (emphasis added). The latter part of the provision speaks in general and plural ("Indian tribes"), rather than specific, terms. Congress could have easily written the statute to specify that contracted programs or services must have been "otherwise provided" to a *requesting tribe*.  It did not. As written—and as it must be interpreted under the Indian canon—Section 450(b)(j) supports, rather than refutes, the Tribe's argument that a tribal contractor may request a self-determination contract for programs or services that the BIA is authorized to provide to Indian tribes, irrespective of whether those services are currently being provided by the Federal Government to a particular tribe. *See Montana*, 471 U.S. at 766 ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.").  The BIA cannot dispute that it provides for law enforcement and judicial functions on Indian Reservations throughout the United States, including the State of California.[3] Accordingly, the

---

[3]  Notice, 69 Fed. Reg. 6321 (Feb. 10, 2004) ("BIA is charged with providing, or assisting in the provision of, law enforcement in Indian country. This is true nationwide - throughout Indian country and in the areas near and adjacent to Indian country.").

Tribe's Title I request was contractible under the ISDA because it implicated programs or services that the Secretary was "authorized to administer" and are "otherwise provided to Indian tribes" under Federal law. 25 U.S.C. §§ 450b(j); 450f(a)(1)(B).

### C. Limiting Title I Contractibility to Programs or Services Currently Provided to the Requesting Tribe Conflicts with the ISDA's Purpose and the Federal Government's Trust Responsibility.

The BIA's misplaced reading of Section 450(b)(j) highlights a fundamental dispute underlying this case. In construing a statute, courts must "look to the provisions of the whole law, and to its object and policy." *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (quoting *United States v. Heirs of Boisdore*, 49 U.S. 113, 122 (1850)). The ISDA was designed with the goal of establishing a policy "which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. § 450a(b). The BIA argues that this "transition" under Title I should be viewed as benefiting only those tribes seeking control over specific programs and services *currently* administered by the Federal Government for the benefit of specific tribes. But as noted above, Section 450f "directs" the Secretary to enter into self-determination contracts for programs "which the Secretary is *authorized* to administer for the

14

benefit of Indians" – not a specific program, and not a specific tribe. *Id*. at

§450f(a)(1)(B) (emphasis added).  That reading of Title I is more faithful to the

ISDA's stated goal of "assuring maximum Indian participation in the direction . . .

of Federal services to Indian communities so as to render such services more

responsive to the needs and desires of those communities." *Id*. § 450a; *see also*

1988 Senate Report, at 23 ("The tribes also have the right under the Indian Self–

Determination Act to work with the Secretary to redesign BIA and IHS Area

Office, Field Office, Agency and Service Unit functions to better meet the needs of

the tribes served directly by such offices.").[4]

The statute's construction is further informed by the United States' trust

responsibility to Indian tribes. "The correct approach to trust responsibility lies . . .

with the Federal Government responding positively to the conditions and

capabilities of individual tribes." 1988 Senate Report at 40. The 1988 Amendments

were thus designed to "strengthen the ability of tribes to contract with the Secretary

to perform trust-related functions, and to participate with the Secretary in trust

responsibility decision-making as equal partners." *Id*. A Title I contract proposal

thus is contractible—and worthy of a response—so long as the request relates to

programs or services that the Secretary is "authorized to administer for the benefit

---

[4] This reading also aligns with the Secretary's "policy . . . that the contractibility of programs under [the ISDA] should be encouraged." 25 C.F.R. § 900.3(b)(8) (1996).

of Indians" in furtherance of the Federal Government's trust responsibility. 25 U.S.

§ 450f(a)(1)(B). Such a proposal is entitled to sincere consideration by the

Secretary so that the tribe may meaningfully "participate . . . in trust responsibility

decision-making as equal partners." 1988 Senate Report at 40.

By allowing Indian tribes to contract for programs that the Secretary is

authorized to administer for their benefit, the ISDA invites the Secretary to engage

in a dialogue with a requesting tribe—thereby allowing the tribe take part in the

decision-making process. *Id*. Under the BIA's reading, however, the Secretary

could simply ignore such a request if the Secretary concludes that there exists no

program currently serving *that* particular tribe.  That is not an "equal

partner[ship]." *Id*.  It is the same bureaucratic recalcitrance that Congress has

condemned again and again. *See id.* at 37 (noting "agencies' consistent failures . . .

to administer self-determination contracts in conformity with the law"); *see also*

1994 Senate Report at 2 (criticizing the "layers of bureaucracy and rules" imposed

on the self-determination contract approval process). The ISDA should be

construed to achieve its purpose.

## III.    THE TRIBE'S ARGUMENT THAT ITS TITLE I REQUEST IS CONTRACTIBLE DOES NOT RENDER SECTION 450F(A)(2)(D) "INOPERATIVE, MEANINGLESS, OR VOID."

Pursuant to Section 450f(a)(2)(D) of the ISDA, the Secretary *may* decline a

Title I contract proposal by providing the requesting tribe with "written

16

notification . . . that contains a specific finding that clearly demonstrates that . . . the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title." 25 U.S.C. § 450f(a)(2)(D). Section 450j-1(a)(1), in turn provides that the amount of funds provided to self-determination contracts under Title I "shall not be less than the . . . Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract[.]" *Id*. § 450j-1(a)(1). This is often referred to as the "Secretarial [A]mount." *Seneca Nation*, 945 F. Supp. 2d at 143.

BIA argues that "under the Tribe's reading of the ISDA, BIA could never rely upon section 450f(a)(2)(D) to decline a contract proposal," which in turn would "render[] section 450f(a)(2)(D) inoperative, meaningless, or void." Appellee's Br. 18. That is a smokescreen. As the Tribe explained in its opening brief, "[h]ad the BIA dignified the Tribe's Title I request with a timely and specific response, it would have been in a position to invoke any statutory basis for a declination it believed proper." Appellant's Br. 37. The Tribe has never argued that the BIA could not decline a Title I contract proposal to create a program that it had not operated previously via a timely declination letter containing a specific finding that the Secretarial Amount for the program is "zero." But the BIA may also *approve* such a proposal. "The [ISDA] sets the Secretarial amount as a floor;

17

tribes are able to negotiate for higher levels of funding." *Seneca Nation*, 945 F.

Supp. 2d at 143.

Even if the BIA were disinclined to negotiate and fund the Tribe's proposed

self-determination contract, "[t]he Secretary's ability to use discretionary funds as

she sees fit does not relieve her obligation to adhere to the standards of [the] Act in

assessing a tribe's proposal." *Pyramid Lake Paiute Tribe v. Burwell*, No. 1:13-cv-

01771, 2014 WL 5013206, *6 (D.D.C. Oct. 7, 2014). In submitting its proposal,

the Tribe expected to engage in a dialogue regarding the "direction . . . of Federal

services" provided to the Tribe so that they might be "more responsive to the needs

and desires" of its members. 25 U.S.C. § 450a. Instead, the Tribe was ignored.

## IV.    *LOS COYOTES* DOES NOT DEFEAT THE TRIBE'S CLAIMS.

In its response, the BIA relies heavily on the Ninth Circuit's decision in *Los

Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025 (9th Cir.

2013). The Tribe already has explained why this case is distinguishable from *Los

Coyotes*. The procedural and legal posture of this case is entirely different than *Los

Coyotes*, where the tribe challenged the "underlying policy" behind BIA's timely

declination finding and where the court was circumscribed by the deferential

"arbitrary [and] capricious" standard of review under the Administrative Procedure

Act. *See* Appellant's Br. 34. *Los Coyotes* also did nothing to displace the

persuasive authority of *Hopland*.

18

BIA argues that "[t]he Tribe's reliance on [*Hopland*] is misplaced because the Ninth Circuit in *Los Coyotes* effectively overruled the portion of *Hopland* upon which the Tribe relies." Appellee's Br. 19. That is not so. The key portion of *Hopland* upon which the Tribe relies is its holding that—due to the Federal Government's obligation under the ILERA to provide law enforcement services in Indian country—law enforcement services are contractible programs under the ISDA. 25 U.S.C. § 2802(a); *Hopland Band of Pomo Indians*, 324 F. Supp. 2d at 1075  ("The ILERA expressly contemplates that such contracts [for law enforcement services] are contractible under the ISDEAA.").[5] Because the services requested in the contract proposal were contractible, the court in *Hopland* held that the BIA was required to follow the ISDA declination procedures and could only deny the contract for one of the five statutorily delineated reasons—which it did not. *See id.*

The question whether law enforcement and tribal justice services are contractible under Title I was never at issue in *Los Coyotes*. 729 F.3d at 1035.

---

[5]    In *Hopland*, "[t]he BIA set forth three reasons to support its decision [to deny the contract], specifically that: (i) deputation agreements and SLECs were not 'programs, functions, services or activities' contractible under the ISDEAA; (ii) since California is a Public Law 280 state, the BIA did not provide law enforcement services to tribes within the state; and (iii) the Department of the Interior had placed a temporary nationwide moratorium on the issuance of deputation agreements preventing the BIA from concluding one with the tribe." *Id.* at 1070.

Rather, *Los Coyotes* concerned the validity of the BIA's *reason for declining* the contract—i.e., whether "Section 450f(a)(2)(D) authorizes the Secretary to reject a contract if the [t]ribe requests more money than the BIA is currently spending on the program." *Id*. Unlike the tribe in *Los Coyotes*, the Yurok Tribe is not challenging the BIA's reason for timely declining a contract proposal. The Tribe's point here is that the BIA *never declined the Tribe's proposal* within the statutory deadline.  The Tribe submitted a proposal for contractible programs and services under the ISDA.  It was entitled to a response in accordance with the approval and/or declination procedures outlined in the statute. 25 U.S.C. § 450f(a)(2). The *Hopland* decision speaks to this issue; *Los Coyotes* does not.[6]

## CONCLUSION

This case is not about whether the BIA *could have* timely declined the Tribe's contract proposal. This case is about BIA's complete failure to respond in compliance with the ISDA's mandatory procedures.  BIA's failure to respond resulted in "deemed approval" of the proposal and award of the contract.  That may seem a draconian result, but it is exactly the result Congress prescribed.[7]

---

[6] The Ninth Circuit's characterization of the ISDA as "a statute that governs existing programs and does not create new ones," *Los Coyotes*, 729 F.3d at 1034, is dicta because it was not necessary to resolve the tribe's claims.

[7] *Seneca Nation*, 945 F. Supp. 2d at 152 ("While this system [calling for deemed approval] may seem imbalanced, Congress designed self-determination contracts to work in this manner for a specific remedial purpose, and the ISDEAA, its

For all of the foregoing reasons, and those in the Tribe's opening brief, the decision of the Civilian Board of Contract Appeals should be reversed, and the matter should be remanded to the Board for a determination of the terms of the deemed contract.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Catherine E. Stetson
Catherine E. Stetson
Lacy Logsdon
Nathaniel Nesbitt
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

</div>

Dated:  November 24, 2014                    *Counsel for Appellant*

---

regulations, and the resulting contracts between Indian tribes and the United States must be read with that remedial intent in mind. By ignoring her deadline, the Secretary became bound to the proposed Contract . . . .").

# CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of November 2014, I caused a copy of the foregoing  Reply Brief of Appellant Yurok Tribe to be served by electronic means via the Court's CM/ECF system on all counsel registered to receive electronic notices:

Joseph Ashman: joseph.ashman@usdoj.gov

/s/ Catherine E. Stetson

Catherine E. Stetson
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Dated:  November 24, 2014             *Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 5,081 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally-spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

/s/ Catherine E. Stetson

Catherine E. Stetson
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Dated:  November 24, 2014                    *Counsel for Appellant*